# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### MONROE DIVISION

| | |
|---|---|
| PAUL CROW | CIVIL ACTION NO. 10-1779 |
| VS. | SECTION P |
| | JUDGE ROBERT G. JAMES |
| BAKER CORPPER, ET AL. | MAG. JUDGE KAREN L. HAYES |

## REPORT AND RECOMMENDATION

*Pro se* Plaintiff Paul Crow, proceeding *in forma pauperis*, filed the instant civil rights Complaint pursuant to 42 U.S.C. §1983 on November 15, 2010, and an Amended Complaint on February 28, 2011. [docs. # 1, 6]. Plaintiff is an inmate in the custody of Louisiana's Department of Public Safety and Corrections. He is presently incarcerated at the Winn Correctional Center, Winnfield, Louisiana. Plaintiff filed suit against James E. Baker (incorrectly named in the complaint as "Baker Corpper"), Reginald Manning (incorrectly named in the complaint as "Lt. Manning"), Kenneth T. Johnson, Jared P. Desadier, and Robert A. Mounts, Jr., requesting $2,600,000 in damages for pain and suffering. The District Court referred the case to the undersigned for a *Flowers* hearing, which was held on December 5, 2012. Also before the court, are two Motions to Dismiss [docs. # 71, 72] orally made during the *Flowers* hearing by Defendants following Plaintiff's presentation of his case.

## Background

In Plaintiff's original Complaint, he alleged that during his confinement at the Ouachita Correctional Center ("OCC"), he was "tortured and starved" by Defendants Baker and Manning for a ten day period, beginning on August 8, 2009, and ending on August 18, 2009, while in

"solitary confinement."  [doc. # 1, ¶ 1].  On February 28, 2011, Plaintiff amended his Complaint

[doc. # 6] to include additional allegations and defendants.  Specifically, he alleged that during

the aforementioned 10-day period, Defendant Baker (1) "tazed him three times[;]" (2) Defendant

Manning threw "a cup of urine into [his] face[;]" and, (3) Defendants Johnson and Desadier hit

him "in the face over ten time [*sic*]."  [doc. # 6,  ¶ 2].  Additionally, Plaintiff alleged that he was

placed into general population without the ability to make telephone calls and without being

afforded medical treatment for injuries sustained during the torture and starvation.  *Id.* at ¶ 4.

Finally, Plaintiff alleged that on October 27, 2009, he was transferred from OCC without his

personal property, and his "$800 was not logged into evidence at OCC."  *Id.*

On September 18, 2012, this Court granted Defendant's Motion for Partial Summary

Judgment and dismissed Plaintiff's claim relating to his loss of property.  [doc. # 59, P. 7].  This

left intact Plaintiff's excessive force, lack of medical treatment, and conditions of confinement

claims.  Accordingly, on December 5, 2012, the undersigned held an evidentiary hearing

pursuant to 28 U.S.C. § 636(b)(1)(B) and *Flowers v. Phelps*, 956 F.2d 488 (5th Cir. 1992).  *See*

[doc. # 73].  At the hearing, Defendants moved to dismiss on the grounds that Plaintiff failed to

meet his burden of proof.  [docs. # 71, 72].

## Factual Findings

At the evidentiary hearing, the Court heard testimony from the Plaintiff, from Defendants

Robert Mounts, Jared Desadier, James Baker, and Reginald Manning, and from Monroe Police

Officer Timothy Cook, Monroe Firefighter Marcus Leonard, and Captain Connie Lee Murray of

the Ouachita Parish Sheriff's Office.  [doc. # 74].   The Court also received into evidence,

without objection, the following exhibits introduced by Defendants:

2

1.      OCC Medical Screening Inquiry and Health Intake Form for plaintiff;

2.      OPSO Booking sheet for plaintiff;

3.      OCC Sick Call request forms;

4.      CD of interview with plaintiff on 8/8/09;

5.      Monroe Fire Department Incident Report;

6.      OCC Cell Change Sheets and A Building Activity Summaries;

7.      Activity summary (feeding schedule) for A dorm; and,

8.      Employee attendance record;

[doc. # 75].

The testimony of each witness is summarized below.

<u>Plaintiff Paul Crow</u>

Plaintiff recounted his arrest, testifying that he was taken "into custody by the Monroe City Police Department," and while he was in custody he was assaulted " by officers that were arresting [him] forcing [him] into the confession."  [doc. # 76, P. 4-5].  Plaintiff was then taken to OCC and was "placed inside B-36 . . . confinement cell." *Id*. at 5.  While in the confinement cell, Plaintiff testified that he received "no meal," "was tased three times," and "placed in a restraint chair three times during" the ten day period.  *Id.*  However, Plaintiff was unable to recall when two of the tasings occurred.  *Id.*  As a result of these incidents, Plaintiff testified that he suffered "a hernia that led on down [his] groin" and a "mental condition."  *Id.* at 6.

On cross examination, Plaintiff admitted that on the day in question, he was arrested on a warrant charging him with attempted murder and ten counts of aggravated battery and ten counts of false imprisonment, and that he later entered a guilty plea on the charges. *Id*. at 7-8.  Plaintiff

3

also admitted that he was in a chase with the police, that he jumped over a fence in an attempt to evade arrest, and that he was running trying to get away from the police. *Id.* at 10-11. Plaintiff claimed that he was "stomped" on his legs while he was on the ground, and punched in the face as he was getting in the police car.  *Id.* at 10.  However, despite the fact that all of the defendants were present, Plaintiff was unable to identify any Monroe Police officer who assaulted him during his arrest as being present in the courtroom.  *Id.*  Plaintiff also stated that, while he was punched in the face, the punch left no marks or bruises of any kind.  *Id.* at 11-12.  Plaintiff also admitted that his interrogation after the arrest was tape recorded. *Id.* at 13.   He claimed that he was forced to confess during the interrogation by officers hitting him in the face with their fists, and agreed that, if such a beating had occurred, it would be audible on the recording of the interrogation. *Id.* at 13-15.  Plaintiff denied any sort of ill treatment by the officer who transported him from the Monroe Police Station to the Ouachita Correctional Center. *Id.* at 15.

In response to questioning from counsel for the Ouachita Parish defendants, Plaintiff admitted that, at the time of his arrest,  he had an extensive criminal history, with prior convictions for unauthorized use of a vehicle and aggravated battery.  Plaintiff then identified Defendant James Baker as the individual who tased him three times.  *Id.* at 17.  At this point, the Defense introduced Plaintiff's Medical Screening Inquiry, which does indeed indicate that Plaintiff self reported on that day that he had been  "[u]ncooperative" and "ha[d] been tased" once, on August 8, 2009.  *Id.* at 18.  Plaintiff was unable to state when the other two tasings occurred, but did maintain that they were at the hands of Defendant Baker during the ten days he claimed to have been held in solitary confinement. *Id.* at 17-18.   Plaintiff stated that, if the prison records showed that he was actually in the general population in A Dorm, Pod 9, during the time

period in question, the records were wrong.  *Id.* at 19.  Plaintiff, despite being confronted with

the records, which showed that he was briefly in B-36, a solitary confinement cell, on August 8,

2009, and again on August 11, 2009, because of problems cooperating with others, but that he

was otherwise in the general population at the jail, continued to claim that he was held in solitary

confinement for 10 days. *Id.*

Plaintiff also claimed that he was not fed for 10 days, and stated that if the records

showed that he was in fact fed, then the records were wrong.  *Id.*

Plaintiff admitted that he reported to the medical screener that he had mental problems

and anger issues, and agreed that he had anger problems in August of 2009.  *Id.* at 20-21.  He

also admitted that he reported using marijuana and PCP, and admitted that he had last used PCP

about an hour or two before his arrest. *Id.* at 21.  He also acknowledged that, when he used PCP,

it tended to make him stronger and angry, although he denied that it made him harder to control.

*Id*. He also admitted that he would react, and let people know that he was angry, but denied that

he would act aggressively toward the police, even while under the influence of PCP. *Id.* at 21-22.

Plaintiff was shown photographs of himself, taken the day of his arrest, and claimed that

there was a mark on his face where he'd been beaten.  However, when it was pointed out to him

that what he pointed to in the photograph did not show anything but a small shadow looking

mark, he explained that he "ain't got hit in the face nothing but a few times." *Id.* at 25.

Plaintiff claimed that he sent a written ARP to the warden while he was at OCC;

however, the copy of the alleged ARP he claimed he wrote while there was addressed to W.J.

Bill Hodge, Clerk of Court for Ouachita Parish, and Plaintiff agreed that it was intended for the

Clerk of Court. *Id.* at 25-26.   He maintained that he sent an ARP to the warden, and that it must

have been destroyed by someone at the jail. *Id.* at 26-27.

Plaintiff was also confronted with the sick call requests he submitted while at OCC, none of which contained any complaints of beatings, tasings, traumatic injury, torture, or starvation.  *Id.* at 28.

Regarding Plaintiff's complaint that he was not given an S.I.D. number and so was unable to use the phone for seven days, Plaintiff admitted that he did not know who was responsible for giving him the number, and could not state that any of the defendants were at fault.  *Id.* at 29.

In response to a question regarding his lack of complaints to medical staff regarding the alleged starvation, Plaintiff stated, contrary to his claim that he was starved while in solitary confinement, that "a lot of people gave me food off their tray because they know I ain't – I tell them I ain't ate in a certain number of days..."  He went on to state "...you know, I wasn't hurt, you know by ten days because by me smoking PCP, it take a appetite from me – the appetite from me by me on that.  I didn't even know I was in there ten days." *Id.* at 32.

On the whole, Plaintiff's testimony was inconsistent, unconvincing, and unsupported by any medical records or other evidence.  He admitted to being under the influence of PCP at the time of his arrest, and was clearly an unreliable witness.  The undersigned finds that he was not a credible witness.  In addition, Plaintiff failed to even testify that anyone through a cup of urine at him as he had alleged in his complaint, and, except for James Baker, failed to identify any of the defendants as having been involved in any of the actions of which he complained.

<u>Robert Mounts, Jr.</u>

Defendant Mounts testified that he responded to a call from 1305 Alabama Street on August 8, 2009, and that, when he arrived, he encountered "a house full of hysterical people." *Id.*

at 36.   He questioned the witnesses and was informed that Plaintiff, Paul Crow, had brandished two handguns and threatened them claiming that they had stolen a SIM card from his cell phone. Mounts recognized Crow's name and description as a suspect in an attempted murder which had occurred the previous night.  He put out a BOLO to all units in the area, giving a description of Crow and the clothing he had been wearing at the Alabama Street home.  Mounts did not see the Plaintiff until after he had been arrested and was in handcuffs.  Mounts saw Crow being attended to by the medical response team and being put into the police car, but he did not take Crow to the Monroe Police Station; that was done by an Officer Avery, who no longer works for the police department.  *Id*. at 36-37.   The next time Defendant Mounts saw Plaintiff was in the police department's interrogation room, along with Officer Fendall.  *Id.* at 38.  Defendant Mounts testified that Plaintiff did not appear injured.  He witnessed Officer Fendall's placing of the recorder on the table, and was present during the entire interrogation. He testified that no one assaulted Plaintiff during the interrogation.  *Id.* at 38-39.  Mounts identified the tape recording and testified that it contained everything that happened in the room during Crow's interrogation. *Id*.  He testified that he was the officer who took Crow to OCC after the interview, and that Crow had no marks or injuries at the time he was taken to OCC.  He pointed out that, if there had been any injuries to the Plaintiff, intake at OCC would not have accepted him unless he had first been taken to the hospital to be checked out.  Therefore, if there had been any possible injury, Mounts would have gone first to the hospital, and not straight to OCC.  *Id.* at 39-41.

        At this point, the tape recording of Crow's interrogation on August 8, 2009, was played. It revealed absolutely no evidence of any beatings, coercion, or inappropriate behavior by the police.  On the contrary, the Plaintiff is clearly eager to talk to the police and, although at times

he tries to blame someone else for the attempted murder and robbery he's being interrogated about, after being confronted with the statements of witnesses and the fact that he was in possession of at least some of the stolen items, he confesses to everything, including the shooting, quite readily.

<u>Timothy Cook</u>

Monroe Police Reserve Officer Timothy Cook testified that he responded to the call which led to Plaintiff's arrest.  *Id.* at 44.  Cook testified that he saw Plaintiff in the back yard of one of the houses in the 1300 block of Georgia Street, identified himself as Monroe police and ordered Plaintiff to stop.  Instead of stopping, Plaintiff "took off running, jumped the fence into the alley" and engaged the officer in a foot pursuit.  *Id.*  Plaintiff proved to be too quick for Officer Cook, and the Officer lost sight of him.  *Id.* at 45.  Then, Officer Cook received a radio call from Officer Desadier, informing him that Desadier had Plaintiff in custody.  *Id.*  Upon arriving at the scene of the arrest, Officer Cook testified that Plaintiff was in handcuffs, but was not responding to anything the officers asked him.  "He was just limp. He wouldn't – was trying to act like he didn't want to be picked up."  *Id.* Officer Cook testified that he did not see any apparent signs of injury, and did not see anyone doing anything physical to Crow except trying to pick him up.  *Id.*  Cook testified that Crow was running very fast during the chase, and that he had no trouble jumping the chain link fence which slowed Cook down.  As chases go, Cook said it was at least a nine on a scale of one to ten. *Id.* at 46.  Cook did not see any injuries on Crow at any time.

<u>Jared Desadier</u>

Defendant Jared Desadier testified that he responded to the BOLO on August 8, 2009,

began walking through an alley between Georgia and Alabama Streets, checking all of the bushes and overgrown brush, and observed the Plaintiff "laying on the ground." *Id.* at 49-50.  Desadier "covered him, advised the other units that [he] had located him." *Id.* at 50.   Plaintiff did not respond to Desadier's order to show his hands, and in fact refused to move at all.  Once Officer Johnson arrived, Desadier continued to cover the Plaintiff while Johnson placed him in handcuffs.  While he was being placed in handcuffs, Plaintiff was apprised of his rights. Thereafter, Desadier and Johnson conducted a pat-down search. *Id.* at 50-51.  Desadier testified that at no point did he or Johnson "stomp" Plaintiff or in any way physically assault him.  *Id.* at 51-52  Plaintiff did not resist being handcuffed.  *Id.* at 51.  Because Plaintiff was unresponsive, "sweating profusely and breathing heavy," paramedics and the fire department were called to the scene because the officers wanted to make sure that the Plaintiff was okay before continuing with anything they needed to do with him.  *Id.* at 52.  Once Plaintiff was cleared by the first responders, he was placed into the back of a police car. Desadier was not responsible for transporting Plaintiff to the Monroe Police Station.  *Id.* at 52-53.  Desadier never saw anyone punch, hit, stomp, or otherwise use force against Plaintiff, and did not see him again after he was taken away in the police car.

Markus Leonard

Monroe Firefighter Marcus Leonard was the first responder who was called to the scene by the Monroe Police.  On arrival, he was asked to check the Plaintiff out  because he "complained of going into shock." *Id.* at 56.  Accordingly, Firefighter Leonard took Plaintiff's vitals, "which showed he was not in shock." *Id.*  Firefighter Leonard testified that Plaintiff was "very sweaty, and he had some dirt on him." However, Plaintiff did not make any comments

9

regarding suffering physical injuries, and was not bleeding or showing any other signs of injury.

*Id.* at 57.  Plaintiff did not have any apparent signs of injury; Leonard did not witness anyone

assault him; and Plaintiff never stated that anyone had hit him at all.   *Id.* at 58-59.

<u>Connie Lee Murray</u>

Captain Connie Lee Murray, Assistant Warden at the Ouachita Parish Correctional

Center, and in that capacity, custodian of records for OCC, including booking, initial arrest

reports, medical intake health and physical reports, court documents, incident reports,

disciplinary reports, cell movements, ARP's, and anything that takes place while each inmate is

incarcerated at the facility, testified regarding Plaintiff's incarceration at OCC. *Id.* at 60-61.

According to the records, on August 8, 2009, Plaintiff was first placed in a booking holding cell,

B-16, and was then later placed in Cell 9A, bed 10, which is in the general population area.

Thus, he spent only a portion of August 8, 2009, in solitary confinement. *Id.* at 62-66.   The

records also show that, on August 11, 2009, Crow had been placed in solitary confinement for

being "uncooperative."  *Id.* at 69- 70.  However, Captain Murray testified that at all other times

between August 8, 2009 to August 18, 2009, Plaintiff was housed in "a 50-man pod." *Id.* at 63-

70.  Inmates that are held in this particular pod have access to four showers where "general

offenders . . . [can] come and go as they wish except for . . . at night." *Id.*  Additionally, Captain

Murray testified that according to an activity summary for A shift, A Dorm, Plaintiff was fed

three time a day from August 8, 2009 until August 18, 2009.  *Id.* at 71.  Finally, Captain Murray

testified that according to Defendant Baker's employment records, it would be impossible for

Defendant Baker to have tased Plaintiff on August 8, 2009, as he "work[s] Monday through

Fridays 7:00 to 4:00," and August 8, 2009 was a Saturday.  *Id.* at 77.   The records also show

10

that neither Baker nor Manning was responsible for feeding the inmates in Pod 9 for any of the times in question, and that the inmates in Pod 9 were in fact fed three times a day every day.  *Id.* at 71-75.  Murray also testified that handing out S.I.D. numbers was the responsibility of Corporal Fonderen, not Baker or any of the other defendants.  Finally Murray testified that there are no ARP's in Crow's file, and that if Crow had submitted any ARP's, they would be in the file. *Id.* at 75-76.

James Baker

Defendant Baker, who was never reprimanded or disciplined or accused of excessive force while he worked for the Ouachita Parish Sheriff's Office, but who voluntarily left his employment due to a personality conflict with the former sheriff, now works for the West Monroe Police Department.  *Id.* at 78-80.  He confirmed that he had not worked weekends at the jail, since 2003 or 2004, and did not work on August 8, 2009; therefore, he could not have, and did not tase Plaintiff.  *Id.* at 81.  Moreover, Baker testified that he did not place Plaintiff into a restraint chair, is not responsible for passing out food to inmates, and did not prevent Plaintiff from taking a shower.  *Id.* at 83.

Reginald Jerard Manning

Sergeant Manning briefly testified regarding Plaintiff's incarceration at OCC.  According to Manning, Plaintiff was "somewhat of a . . . menace," he took advantage of certain inmates and strong armed them.  *Id.* 85.  In fact, Manning testified that on several occasions, he had to "talk with [Plaintiff] or move him out of a cell to make things better."  *Id.*  Manning denied throwing "a cup of urine onto Plaintiff."  *Id.* at 85-86.  Furthermore, Manning testified that he did not hear of Officer Baker physically harming Plaintiff; Plaintiff was not placed in solitary confinement for

11

a ten day period in August; and Manning was not responsible for handing out S.I.D. numbers to inmates. *Id.* at 86.

Plaintiff did not cross examine any of the defense witnesses, and there is no basis to doubt any of their testimony. The undersigned finds that the defense witnesses were credible, and that their testimony is supported by the records and evidence introduced, without objection, into the record herein.

### LAW AND ANALYSIS

"An evidentiary hearing consistent with *Flowers v. Phelps* amounts to a bench trial replete with credibility determinations and findings of fact." *Adkins v. Kaspar*, 393 F.3d 559, 563 (5th Cir. 2004) (citations and internal quotation marks omitted). Further, "[a] civil plaintiff seeking to recover damages for use of excessive force must prove his claim by a preponderance of the evidence." *Yarrito v. Cook*, 1995 WL 17788756 (5th Cir. June 22, 1995) (unpubl.) (citation omitted). "Preponderance" means that it is more likely so, than not so. *Matter of Briscoe Enterprises, Ltd., II*, 994 F.2d 1160, 1164 (5th Cir. 1993) (citation omitted). It remains within the province of the finder of fact to weigh conflicting evidence and inferences and to determine the credibility of witnesses. *See Yarrito*, *supra*.

At the close of the presentation of Plaintiff's evidence herein, Defendants moved to dismiss Plaintiff's claims. In a bench trial, "the appropriate vehicle for dismissing a case as a matter of law at the close of plaintiff's evidence is a Rule 52(c) judgment on partial findings." *Weber v. Gainey's Concrete Products, Inc.*, 1998 WL 699047, *1 n1 (5th Cir. Sept. 21, 1998) (unpubl.) (citation omitted). Rule 52 provides, in pertinent part,

**Judgment on Partial Findings**. If a party has been fully heard on an issue during

> a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of the evidence. A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

FED.R.CIV.P. 52(c).  When deciding a case pursuant to Rule 52(c), the court is not required to make any special inferences or construe the facts in the light most favorable to the plaintiff. *Weber, supra.*  Based on the Plaintiff's inconsistent and incredible testimony, his inability to identify any of his alleged attackers, his admission that he was under the influence of PCP at the time of his arrest, and the lack of support for any of his claims, the undersigned recommends that the defendant's motion be Granted and this matter dismissed with prejudice.  Alternatively, and considering the testimony and evidence presented by the defendants, the undersigned also recommends that Plaintiff's claims be dismissed with prejudice.

As stated *supra*, Plaintiff has three remaining claims: (1) excessive force relating to his "torture"; (2) failure to provide adequate medical treatment for the injuries sustained during the torture; and, (3) conditions of confinement relating to the "starvation," the ten days he spent in solitary confinement between August 8, 2009, and August 18, 2009, and his inability to make telephone calls after being placed into general population.  These claims will be addressed in turn.

## I.      Excessive Force

When an official is accused of using excessive physical force in contravention of the Eighth Amendment's Cruel and Unusual Punishments Clause, the core judicial inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously

and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992) (citing *Whitley v. Albers*, 475 U.S. 312 (1986)); *Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir.1997).  However, not every malevolent touch by a prison guard gives rise to a federal cause of action.  *Id*. (citation omitted).  The Eighth Amendment also does not protect against *de minimis* use of physical force, so long as the use of force is not of a sort "repugnant to the conscience of mankind."  *Id*. (citation and internal quotation marks omitted).[1]  Thus, in considering an excessive force claim, the court should consider the following factors: (1) the extent of the injury suffered; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and, (5) any effort made to temper the severity of a forceful response.  *Gomez v. Chandler*, 163 F.3d 921, 923 (5th Cir.1999).

Plaintiff makes several excessive force allegations; specifically, Plaintiff claims on August 8, 2009 his legs were "stomped" and "was hit in . . . [the] face . . . if [he] didn't make a confession on tape . . . at [the] Monroe City Police department" by Defendants Johnson, Desadier, and Mounts.  [docs. # 67, P. 1; # 76, P. 10].  Thereafter, he was transferred to OCC where he was allegedly tased and "cover[ed] in urine" by Defendants Baker and Manning.  *Id*.

This case hinges upon credibility.  Plaintiff's credibility is certainly questionable as he openly admitted using "PCP" one or two hours prior to his arrest on August 8, 2009, and "smoking crack" all of the previous evening.  [doc. # 76, P. 21, 64].  During the *Flowers* hearing,

---

[1]  The PLRA further provides that "[n]o [f]ederal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."  42 U.S.C.A. § 1997e(e).  The Fifth Circuit has equated § 1997e(e)'s "physical injury" requirement with the standard used under the Eighth Amendment; that is, an injury that is more than de minimis, but not necessarily significant.  *Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir. 1997).

14

Plaintiff claimed he was hit in the face several times during the August 8, 2009, interrogation. However, defense counsel played a recording of the interrogation, and the recording completely failed to support Plaintiff's claim. On the tape, Plaintiff not only explicitly stated that he was not coerced, threatened, nor beaten into the confession; he sounded very willing to talk; there were no sounds of violence or shouting; and Plaintiff did not complain at all about his treatment or mention being previously "stomped" by Defendants.  *See Id.* at 42.

Additionally, Markus Lenard of the Monroe Fire Department, a non-party witness, testified that Plaintiff's vital signs were normal at the scene, that there were no apparent signs of injury, and that Plaintiff did not complain of being hit or "stomped" by Defendants.  *Id.* at 56-58. Furthermore, Plaintiff was unable to identify any of the defendants as having been the officers who allegedly injured him.

Plaintiff testified that , upon being transferred to OCC, he was tased three times by Defendant Baker. *Id.* at 3. Indeed, Plaintiff's medical screening inquiry form does state "[u]ncooperative, has been tased" on August 8, 2009; however, that statement is questionable as it is self-reported by a person under the influence of PCP, and there is no evidence at all that he was tased a second or a third time.  *Id.* at 18.  Significantly, Captain Connie Lee Murray testified that it would simply be impossible for Defendant Baker to have tased Plaintiff on this date as he "work[s] Monday through Fridays 7:00 to 4:00" and August 8, 2009 was a Saturday.  *Id.* at 77. Additionally, Defendant Baker's employment records corroborate the fact that he worked "no hours" on August 8, 2009.  *Id*. at 77-78.  Again, Plaintiff's story is completely lacking in credibility.

Additionally, Plaintiff failed to support his allegations with any evidence of his injuries.

15

Specifically, when asked by the Court what injuries he suffered as a result of the aforementioned alleged incidents of excessive force, he replied: "I suffered mental condition . . . and suffer[ed] a hernia that led on down the groin.  It went away; like, years later it went away, but I suffered a hernia too at that time."  [doc. # 76, P. 6].   However, there is no evidence that Plaintiff sought any medical treatment for any traumatic injury at any time.   There are no medical records supporting a claim that he suffered from any physical or mental injury, or that he was even diagnosed as having a hernia or a mental disorder, much less any records supporting a claim that plaintiff's alleged hernia, which apparently healed itself without medical intervention of any kind, was caused by any action of the defendants. In addition, there is no evidence that Plaintiff filed an ARP grievance with the Warden of OCC.  In fact, an OCC sick call request submitted by Plaintiff on August 19, 2009, in which he complains of many ailments, makes no mention of being tased or beaten by Defendants or of any other mistreatment by the defendants.

The undersigned finds that Plaintiff is not a credible witness, and that he has utterly failed to meet his burden of proof herein.  Accordingly, the undersigned concludes that Plaintiff has not established that Defendants violated his Eighth Amendment protections against excessive force.

## II.   Medical Care

"A prison official violates the Eighth Amendment's prohibition against cruel and unusual punishment when his conduct demonstrates deliberate indifference to a prisoner's serious medical needs, constituting an 'unnecessary and wanton infliction of pain.'"  *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006) (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).  "A prison inmate can demonstrate an Eighth Amendment violation by showing that a prison official 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in

16

any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'"  *Id.* at 464 (quoting *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001)).

To act with deliberate indifference, a state actor must consciously disregard a known and excessive risk to the victim's health and safety.  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The Fifth Circuit has emphasized that the test of deliberate indifference is a "significantly high burden for plaintiffs to overcome."  *Hernandez ex rel. Hernandez v. Tex. Dep't of Protective & Regulatory Servs.*, 380 F.3d 872, 882 (5th Cir. 2004)(citation omitted).  A plaintiff must demonstrate culpability a degree beyond mere negligence, or even gross negligence.  *Id.*; *see also James v. Harris Cnty.*, 577 F.3d 612, 617-18 (5th Cir. 2009) (internal quotations and citation omitted) ("Deliberate indifference is a degree of culpability beyond mere negligence or even gross negligence; it must amount to an intentional choice, not merely an unintentional oversight."); *Alton v. Tex. A&M Univ.*, 168 F.3d 196, 201 (5th Cir. 1999) ("Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference . . .").

Liability based on deliberate indifference is inappropriate if an official can demonstrate "that [he or she] did not know of the underlying facts indicating a sufficiently substantial danger and that [he or she was] therefore unaware of the danger, or that [he or she] knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent."  *Farmer*, 511 U.S. at 844.  Moreover, it is not enough to demonstrate than an official is aware of a substantial risk—rather, such an official "may be found free from liability if [he or she] responded reasonably to the risk, even if the harm ultimately was not averted."  *Id.*

17

In this case, Plaintiff neither testified that he alerted Defendants of his need for medical care, nor did he provide any evidence that Defendants acted with deliberate indifference to any serious medical needs.  In fact, the record shows that Plaintiff filed several sick call requests while he was incarcerated in OCC complaining of chest pains, swelling around his penis, and general pain around the right side of his body.  [doc. # 76, P. 27-28].  The records show that Plaintiff received the appropriate medical care from the OCC medical staff for his stated complaints.  *Id.*  Additionally, Plaintiff does not contend ,nor did he testify, that Defendants prevented him from filing additional sick call requests or stopped him from receiving medical care. Therefore, the undersigned finds that Plaintiff has failed to prove that Defendants acted with deliberate indifference to a serious medical need.  Accordingly, the undersigned concludes that Plaintiff has not established that Defendants violated his Eighth Amendment protections relating to the denial of medical attention.

**III.     Conditions of Confinement & Telephone Use**

The United States Supreme Court, in a seminal case, definitively held "that a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."  *Farmer*, 511 U.S. at 847. Additionally, the Court proclaimed that there is a right to safety in prison. *See Davidson v. Cannon*, 474 U.S. 344, 352 (1986).

However, it is well settled law that "that disciplinary segregation does not present the type of "atypical, significant deprivation in which a State might conceivably create a liberty interest." *Sandin v. Conner*, 515 U.S. 472, 486 (1995).  Accordingly, sanctions that are "merely

18

changes in the conditions of [an inmate's] confinement" do not implicate due process concerns. *Madison v. Parker*, 104 F.3d 765, 768 (5th Cir. 1997).  Solitary confinement on a temporary basis is the type of sanction that does not pose an atypical or significant hardship beyond the ordinary incidents of prison life.  *See Id.* at 768; *see also Sandin*, 515 U.S. at 486.

In this case, Plaintiff claims that he was placed in "(B-36) Solitary Confinement Rubber Room for the first ten days of [his] arrest, . . . was starved, . . . [and] was not giv[en] a shower, or water." [doc. # 67, P. 1].  The undersigned finds that the Plaintiff's self-serving and inconsistent testimony is in no way credible.  In response to these allegations, Defendants provided certified copies of Plaintiff's records.  On Plaintiff's health intake form it does state "has been in B-36, uncooperative" on both August 8, 2009, and August 11, 2009.  However, after Plaintiff was initially booked into OCC, Captain Connie Lee Murray testified that, according to the records, Plaintiff was placed in Cell 9A, bed 10, and only spent  portions of August 8, 2009 and August 11, 2009 in solitary confinement for being "uncooperative."  *Id.* at 63, 70.  According to Captain Murray, at all other times between August 8, 2009 to August 18, 2009 Plaintiff was placed in "a 50-man pod."  *Id.* at 63.  Inmates in the pod, which is general population housing, have access to four showers where "general offenders . . . [can] come and go as they wish except for . . . at night."  *Id.*  Moreover, Captain Murray testified that according to an activity summary for A shift, A Dorm, Plaintiff was fed three times a day – at 3:00am, 10:00am, and 3:00pm – from August 8, 2009 until August 18, 2009.  *Id.* at 71.  Plaintiff, at one point in his testimony, admitted that because he was under the influence of PCP, he "didn't even know I was in there ten days." *Id.* At 32.  Neither his own testimony nor the records of his incarceration support his claims of ill treatment.  Therefore, under the Supreme Court's holding in *Sandin v. Conner* and its progeny,

19

Plaintiff does not have a claim cognizable under the federal constitution for alleged starvation or time spent in solitary confinement.

Next, Plaintiff claims that Defendants did not provide an S.I.D. number, necessary to make collect calls, for approximately a week. [doc. # 67, P. 1].   The Fifth Circuit has not specifically stated that prisoners have a constitutional right to use the telephone.  However, in *Lopez v. Reyes*, 692 F.2d 15, 17 (5th Cir. 1982), it held that inmates have no right to unlimited telephone use, arguably implying that there may be a constitutional right to some telephone access.  Such an interpretation is consistent with other courts, which have specifically held that inmates have a First Amendment right to reasonable access to the telephone so that they can contact their family and friends.  *See Washington v. Reno*, 35 F.3d 1093, 1099-1100 (6th Cir. 1994); *Johnson v. Galli*, 596 F. Supp. 135, 138 (D. Nev. 1984).   However, the Fifth Circuit has also held that there are no Fourteenth or Eighth Amendment violations when a detained parolee "was denied visitation, **telephone access**, recreation, mail, legal materials, sheets, and showers **for a three-day period**."  *Hamilton v. Lyons*, 74 F.3d 99, 106-07  n.8 (5th Cir. 1996) (emphasis added).

Although Plaintiff alleges that he was unable to make telephone calls for seven days, four days longer than in *Hamilton*, he can not demonstrate that any of the named Defendants were under a duty to provide him with an S.I.D. number.  Additionally, according to Captain Murray, Corporal Fonderen was responsible for providing S.I.D. numbers to OCC inmates, not Defendant Baker or Defendant Manning, the only OCC employees named as defendants in the suit.  [doc. # 76, P. 75].

Accordingly, the undersigned concludes that Plaintiff has not established that Defendants

20

violated his constitutional protections relating to the conditions of his confinement at OCC or access to the telephone.

### CONCLUSION

For the above-assigned reasons,

**IT IS RECOMMENDED** that Defendants' Motions to Dismiss [docs. # 71, 72] be **GRANTED** and Plaintiff's claims be **DISMISSED WITH PREJUDICE**,.  In the alternative, it is recommended, based on the entire record of the evidentiary hearing, that Plaintiff's claims be **DISMISSED WITH PREJUDICE**.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.C.P. Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Monroe, Louisiana, this 24th day of January, 2013.


KAREN L. HAYES
U. S. MAGISTRATE JUDGE

22